1  John W. Thornburgh (SBN 154627)
   Lara S. Garner (SBN 234701)
2  Thomas N. Millikan (SBN 23430)
   Fish & Richardson P.C.
3  12390 El Camino Real
   San Diego, California 92130
4  Telephone: (858) 678-5070
   Facsimile: (858) 678-5099
5  Attorneys for Defendants

6  DIRECTV, Inc., DIRECTV Enterprises, LLC,
   The DIRECTV Group, Inc., DIRECTV Holdings LLC,
7  DIRECTV Operations LLC

8                  UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11 | Multimedia Patent Trust | Case No. 09-cv-0278 H (CAB)

12 |                  Plaintiff, | **DIRECTV'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PRODUCTS LICENSED THROUGH MPEG LA AND SUBJECT TO EXHAUSTION**

13 |          v.

14 | DIRECTV, Inc., DIRECTV Enterprises, LLC, The DIRECTV Group, Inc., DIRECTV Holdings
15 | LLC, DIRECTV Operations LLC,

   |  | Date:        September 26, 2011
16 | DISH DBS Corporation, DISH Network | Time:        10:30 a.m.
   | Corporation, DISH Network LLC, EchoStar | Courtroom:  13, Fifth Floor
17 | Corporation, EchoStar Orbital Corporation, | Judge:       Hon. Marilyn L. Huff
   | EchoStar Technologies LLC,

18

19 | Imation Corporation, Imation Enterprises | **REDACTED**
   | Corporation, Memorex Products, Inc.,

20 | Polycom, Inc.,

21 | Proview Technology Inc.,

22 | Vizio, Inc.,

23 | Westinghouse Digital Electronics, LLC,

24 |                  Defendants,

25

26

27

28

i

1

2   DIRECTV, Inc., DIRECTV Enterprises, LLC,
    The DIRECTV Group, Inc., DIRECTV Holdings
3   LLC, DIRECTV Operations LLC,

    Imation Corporation, Imation Enterprises
4   Corporation, Memorex Products, Inc.,

5   Vizio, Inc.,

6                       Counter-Claimants,

7        v.

8   Multimedia Patent Trust

9                       Counter-Defendant,

10
    _____

11  Westinghouse Digital Electronics, LLC,

12                      Third-Party Plaintiff,

13       v.

14  Tatung Co., Ltd.,

15                      Third-Party Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 09-cv-0278 H (CAB)

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II. Statement of Facts ............................................................................................. 2

   A.  DIRECTV Purchases the Accused Products from Licensees of the MPEG-2 Patent Pool. ................................................................ 2

   B.  The Rights of the MPEG-2 Patent Pool Licensees. ............................. 4

      1.  Rights Under the 2002 License. ................................................ 5

      2.  Rights Under the 2009 License. ................................................ 6

   C.  MPT is a Licensor of the MPEG-2 Pool. ............................................ 7

III. THE SUMMARY JUDGMENT STANDARD ................................................ 10

IV. ARGUMENT ................................................................................................... 10

   A.  MPT Has Exhausted Its Right to Collect Damages for Products Covered by the 2002 License. ........................................................... 10

      1.  DIRECTV's Suppliers' Sales of Accused Equipment to DIRECTV Under the 2002 License Exhausted Rights to the Patents-in-Suit. ............................................................... 10

      2.  Exhaustion Applies When, as Here, the Original Sale is Licensed. .................................................................................. 14

      3.  The 2009 License Is Not a Novation of the 2002 License. ...... 15

   B.  The 2009 License Also Grants Rights to MPT's Patents for at Least MPEG-2 Broadcast Decoders and MPEG-2 Broadcast Encoders. .......................................................................................... 20

      1.  DIRECTV's Suppliers' Sales of Accused Equipment to DIRECTV Under the 2009 License Exhausted Rights to Four of the Patents-in-Suit ................................................... 20

      2.  Exhaustion Applies When, as Here, the Original Sale is Licensed. .................................................................................. 23

V.  CONCLUSION ................................................................................................ 23

i

# TABLE OF AUTHORITIES

**CASES**            **PAGE**

*Abuelhija v. Chappelle,*
   2009 WL 1883787 (S.D.N.Y. June 29, 2009)........................................................................ 18

*Arzani v. People,*
   149 N.Y.S.2d 38 (N.Y. Sup. Ct. 1956) ............................................................................... 19

*Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,*
   90 F. Supp. 2d 401 (S.D.N.Y. 2000)................................................................................... 19

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................................................................. 10

*Dialcom, LLC v AT&T Corp.,*
   2008 WL 2581876 (N.Y. Sup. Ct. 2008) ........................................................................... 18

*Globe Food Servs. Corp. v. Consol. Edison Co. of N.Y., Inc.,*
   584 N.Y.S.2d 820 (N.Y. App. Div. 1992) ......................................................................... 18

*In re Cohen,*
   422 B.R 350 (E.D.N.Y. 2010)....................................................................................... 17, 18

*In re Primex Int'l Corp.,*
   89 N.Y.2d 594 (1997) ......................................................................................................... 18

*Intel Corp. v. ULSI Sys. Tech.,*
   995 F.2d 1566 (Fed. Cir. 1993)........................................................................................... 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)............................................................................................................. 10

*Quanta Comp., Inc. v. LG Elecs., Inc.,*
   553 U.S. 617 (2008)........................................................................................... 1, 15, 16, 24

*Ruso v. Morrison,*
   695 F. Supp. 2d 33 (S.D.N.Y. 2010)................................................................................... 17

*Sanders v. Brown,*
   504 F.3d 903 (9th Cir. 2007)............................................................................................... 10

*Security Watch, Inc. v. Sentinel Sys., Inc.,*
   176 F.3d 369 (6th Cir. 1999)............................................................................................... 18

*TransCore, LP v. Elec. Transaction Consultants Corp.,*
   563 F.3d 1271 (Fed. Cir. 2009).............................................................................. 15, 16, 25

1

**OTHER AUTHORITIES**

2

Fed. R. Civ. P. 56(a).................................................................................................................... 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 09-cv-0278 H (CAB)

## I.   INTRODUCTION

MPT accuses DIRECTV of infringing its video patents by using broadcast decoders, broadcast encoders, and set-top boxes in its satellite television system to transmit and receive data using the MPEG-2 and H.264 video standards. But DIRECTV buys the accused products from licensed suppliers. Those suppliers receive their rights to practice MPEG-2 from a third party called the "MPEG Licensing Authority" ("MPEG LA"). MPEG LA "pools" various patents together so that its licensees can sign just one agreement while obtaining rights to a large collection of related patents. Four of MPT's patents-in-suit are in the MPEG-2 pool. The MPEG-2 pool broadly authorizes DIRECTV's licensed suppliers to make, have made, use, and sell products practicing MPT's patents. Under the law of patent exhaustion, an authorized sale "terminates all patent rights to that item." *See Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Thus, MPT is precluded from seeking damages on these products.

The present motion focuses on the rights granted to DIRECTV and its suppliers under two of MPEG LA's form licenses for the MPEG-2 pool: the 2002 License and the 2009 License. First, DIRECTV seeks summary judgment on the following products it purchased from licensed suppliers under the 2002 License: all set-top boxes, all broadcast decoders, and broadcast encoders. Second, at this time DIRECTV also seeks summary judgment on two categories of products it purchased from licensed suppliers under the 2009 License: MPEG-2 broadcast encoders and MPEG-2 broadcast decoders.[1]

MPT's only response, as exemplified in its recent summary judgment motion, is to claim the 2009 License is a "novation" that extinguishes all rights under the 2002 License. But this argument rests on a tortured interpretation of the 2009 License's boilerplate integration clause which cannot satisfy the stringent novation standard under the governing New York law. Moreover, contrary to the 2002 License's express terms, the 2009 License never "specifically references" amending it, much less novating it. Indeed, there is no evidence MPEG LA, its licensors, or its licensees ever discussed amending or novating the 2002 License. In fact,

---

[1] This subset is ripe for summary judgment, while other rights may require additional discovery or may be subject to fact disputes.

1    MPEG LA told MPT's trustee that the intent of the 2009 License was to **preserve** all rights under

2    the 2002 License.  That makes perfect sense; otherwise the 2009 License would be attempting to

3    retroactively resurrect previously exhausted patent rights in hundreds of millions of products sold

4    by the fourteen hundred or more pool licensees under the 2002 License.

5         The issues presented here are all matters of law that should be resolved in DIRECTV's

6    favor.  Doing so will substantially reduce the number of products and issues for trial and promote

7    settlement.

8    **II.      STATEMENT OF FACTS**

9         **A.      DIRECTV Purchases the Accused Products from Licensees of the MPEG-2**
              **Patent Pool.**
10

11        DIRECTV provides satellite television services to millions of customers nationwide.  To

12   properly display a television program, DIRECTV must transmit vast amounts of video and audio

13   information at high speeds to the customer's television set.  That high-speed transmission is

14   carried out in the following manner.  Television networks, like HBO and Comedy Central,

15   transmit encoded (compressed) data to a DIRECTV Broadcast Center.  There, broadcast decoders

16   receive the data, decompress it, and send it to broadcast encoders.  The encoders perform a more

17   advanced compression and then transmit the data to a DIRECTV satellite.  The satellite transmits

18   the compressed data to a set-top box ("STB") at a customer's home, which decodes the data for

19   display on the customer's television.  Each transmission step involves only compressed

20   information, which reduces the amount of data involved.

21        Many different companies and different types of equipment are involved in the high-speed

22   transmission of these video and audio signals.  For example, DIRECTV purchases its encoders,

23   decoders, and STBs from multiple suppliers.  To ensure everyone's equipment is compatible, the

24   industry developed standard methods of encoding and decoding the data.  While DIRECTV

25   practices two standards, MPEG-2 and H.264, the standard relevant to this motion is MPEG-2.

26        The "MPEG-2 standard" actually includes two pieces: the MPEG-2 video standard

27   (ISO/IEC 13818-2) and the MPEG-2 systems standard (ISO/IEC 13818-1).  (Millikan Decl., Ex. 2,

28   MPEG LA 30(b)(6) deposition at 113:6-115:2; Millikan Decl., Ex. 17 at 1.)  The MPEG-2 video

1   standard defines a way to compress and decompress video. (*Id.* at 2.)  The MPEG-2 systems

2   standard defines the MPEG-2 "transport stream," *i.e.*, how digital video and audio should be

3   packaged for transmission where the beginning and end of the stream may not be identified, such

4   as in broadcast TV.  Other video formats, such as H.264 compressed video, can be packaged into

5   an MPEG-2 systems format.  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 112:24-

6   113:14.)

7           One potential impediment to creating a product using an industry standard is that various

8   companies may have hundreds of different patents that are necessary to practice it.  (*See* Millikan

9   Decl., Ex. 15 (explaining that such a "patent thicket" impedes adoption of technology); Millikan

10  Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 154:3-14.)  Anyone wanting to practice the

11  standard would need licenses from each of those companies, for each of their patents.  The

12  solution has been the creation of so-called patent pools," wherein any party with patents related to

13  a particular standard may license them to the pool administrator.  Parties using the technology can

14  then sign one license, from the administrator, for all the patents that the pool licensors have

15  contributed.  Each licensor receives royalties when others use its patents and each licensee pays

16  royalties to use the patents.  In this way, each party is fairly compensated for its intellectual

17  property, while the standard remains affordable and convenient to use.

18          MPEG LA, LLC runs the patent pool relevant to this motion, the MPEG-2 Patent Portfolio.

19  Like any patent pool, the MPEG-2 pool enables multiple MPEG-2 users to acquire essential patent

20  rights from multiple patent holders in a single transaction as an alternative to negotiating separate

21  licenses.  (Millikan Decl., Ex. 16.)  The pool provides rights to over 900 patents determined to be

22  "essential" to the MPEG-2 video and systems standards.  (Millikan Decl., Ex. 17 at 1-2.)  An

23  entity that owns one or more MPEG-2 essential patents, as determined by the pool's procedures,

24  can also elect to join as a "Licensor" and receive a share of the royalties.  (*See, e.g.*, Millikan

25  Decl., Ex. 17 at § 7.4.)

26          The MPEG-2 pool's founders signed two relevant initiating documents in 1997: (1) the

27  Agreement Among Licensors ("AAL"),

28

1

2

3  (*See, e.g.,* Millikan Decl., Ex. 18 (the original AAL); Millikan Decl., Ex. 3 (Alcatel's LFLTLA).)

4

5  (*See, e.g.*, Millikan Decl., Ex. 19 (MPT assenting to the

6  AAL); Millikan Decl., Ex. 10 (MPT granting rights under the 1997 license); Millikan Decl., Ex.

7  11 (MPT granting rights under the 2002 License); Millikan Decl., Ex. 13 (MPT granting rights

8  under the 2009 License).)

9       DIRECTV obtains its accused encoders, decoders, and STBs from vendors that are

10  licensed to the MPEG-2 pool including                  (Millikan Decl.,

11  Ex. 2, MPEG LA 30(b)(6) deposition at 90:13-110:3; *see also* Millikan Decl., Ex. 1 (listing

12  MPEG LA licenses held by DIRECTV's licensed suppliers).)[2]  These suppliers are licensed to

13  every patent in the MPEG-2 pool.  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 8:18-

14  21.)

15  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 117:60-120:19; Millikan Decl., Ex. 14

16  (listing licensees in good standing).)

17       **B.**    **The Rights of the MPEG-2 Patent Pool Licensees.**

18       Companies wanting to obtain rights to the patents in MPEG LA's MPEG-2 patent pool do

19  so by signing MPEG LA's form portfolio license.  That form has been significantly modified only

20  twice since the MPEG-2 pool was formed in 1997, once in 2002 ("the 2002 License") and most

21  recently in 2009 ("the 2009 License").  Because DIRECTV's licensed suppliers adhered to

22  licenses identical to the 2002 License and/or the 2009 License, the following discussions apply

23  equally to those licensees.  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 90:15-110:3;

24  *see also* Millikan Decl., Ex. 1 (listing DIRECTV's licensed suppliers and their MPEG LA

25  licenses).)

26

27

28

---

[2] DIRECTV may have additional licensed suppliers depending on the scope of MPT's
infringement contentions, which are ambiguous and the subject of a motion currently pending
before Magistrate Judge Bencivengo.

1

### 1.    Rights Under the 2002 License.

The 2002 License gives pool licensees, including DIRECTV's suppliers, "a sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio" to "make, have made, use, sell, offer for sale or otherwise distribute" products that practice the MPEG-2 standard, including the MPEG-2 video standard or the MPEG-2 systems standard.  (Millikan Decl., Ex. 17 at §§ 2.2, 2.3, 2.5; Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 113:25-115:2.)  The 2002 License defines three relevant categories of "Licensed Products":  MPEG-2 Decoding Products, MPEG-2 Distribution Encoding Products, and MPEG-2 Transport or Program Stream Products. (Millikan Decl., Ex. 17 at §§ 1.7, 1.14, 1.16, 1.27.)  DIRECTV's accused STBs, broadcast encoders, and broadcast decoders each fall within one of these categories, as shown in the following table.

| DIRECTV Accused Product | MPEG-2 Functionality | Product Category |
|---|---|---|
| Standard definition STBs, which perform MPEG-2 decoding | MPEG-2 decoding | "MPEG-2 Decoding Product" (Millikan Decl., Ex. 17 at §§ 1.14, 2.2) |
| High definition STBs, which perform MPEG-2 and H.264 decoding | MPEG-2 decoding | "MPEG-2 Decoding Product" (Millikan Decl., Ex. 17 at §§ 1.14, 2.2) |
| MPEG-2 broadcast decoders, which perform MPEG-2 decoding | MPEG-2 decoding | "MPEG-2 Decoding Product" (Millikan Decl., Ex. 17 at §§ 1.14, 2.2) |
| Hybrid MPEG-2/H.264 broadcast decoders, which can perform both MPEG-2 and H.264 decoding | MPEG-2 decoding | "MPEG-2 Decoding Product" (Millikan Decl., Ex. 17 at §§ 1.14, 2.2) |
| MPEG-2 broadcast encoders, which perform MPEG-2 encoding | MPEG-2 encoding | "MPEG-2 Distribution Encoding Product" (Millikan Decl., Ex. 17 at §§ 1.16, 2.3) |
| Hybrid MPEG-2/H.264 broadcast encoders, which can perform both MPEG-2 and H.264 encoding | MPEG-2 encoding | "MPEG-2 Distribution Encoding Product" (Millikan Decl., Ex. 17 at §§ 1.16, 2.3) |
| H.264 broadcast encoders, which create MPEG-2 transport streams | MPEG-2 transport stream generation | "MPEG-2 Transport or Program Stream Product" (Millikan Decl., Ex. 17 at §§ 1.27, 2.5) |

(Millikan Decl., Ex. 20; Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 111:1-8 (MPEG-2 Decoding Product); *id.* at 111:12-112:6 (MPEG-2 Distribution Encoding Products); *id.* at 112:7-113:14 (MPEG-2 Transport or Program Stream Products).)

1    The 2002 License grants rights not only to the patents in the pool at the time of the license,

2  but also any other patents that are subsequently added to it.  (*Id.* at § 1.22; *see also* Millikan Decl.,

3  Ex. 2, MPEG LA 30(b)(6) deposition at 90:21-91:11 █████████████████████████

4  ████████████████████████████████████████████████.)  One such

5  provision, section 7.6.1, requires MPEG LA to add any new patent rights it acquires.  (*Id.* at

6  § 7.6.1.)

7    The grants under the 2002 License begin as of the "effective date" of June 1, 1994.

8  (Millikan Decl., Ex. 17 at § 0.1.)  This allows licensees to acquire rights for products sold prior to

9  joining the pool in exchange for making "catch up" payments on past royalties due.  (Millikan

10  Decl., Ex. 17 at § 3.3.2; Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 122:15-123:3.)

11  However the 2002 License provides for an absolute license grant, not subject to payment.

12  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 117:60-120:19; Millikan Decl., Ex. 17 at

13  §§ 2.2, 2.3, and 2.5.)  The 2002 License grants expire on December 31, 2010.  (Millikan Decl., Ex.

14  17 at § 6.1.)

15    The "validity, construction and performance" of the 2002 License is governed by New

16  York law.  (Millikan Decl., Ex. 17 at § 7.18.)

17    **2.    Rights Under the 2009 License.**

18    Like the 2002 License, the 2009 License gives all pool licensees, including DIRECTV's

19  suppliers, "a royalty bearing worldwide, nonexclusive, nontransferable sublicense under all

20  MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio" to "make, have made, use, sell, offer

21  for sale or otherwise distribute" products that fall within its categories.

22    However, the 2009 License only contains two relevant categories of products:  MPEG-2

23  Decoding Products and MPEG-2 Encoding Products.  (Millikan Decl., Ex. 22 at §§ 1.11. 1.12.)

24  While "MPEG-2 Decoding Products" retains the same scope as in the 2002 License, (*id.* at § 1.11;

25  Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 115:4-116:1), "MPEG-2 Encoding

26  Product" was been broadened to include the previously separate category of "MPEG-2

27  Distribution Encoding Products."  (*Id.* at § 1.12; Millikan Decl., Ex. 2, MPEG LA 30(b)(6)

28

deposition at 115:4-20.) DIRECTV's MPEG-2 broadcast decoders and MPEG-2 broadcast encoders, a subset of DIRECTV's accused products, fall within these categories, as shown below.

| DIRECTV Product | MPEG-2 Functionality | Product Category |
|---|---|---|
| MPEG-2 broadcast decoders, which perform MPEG-2 decoding | MPEG-2 decoding | "MPEG-2 Decoding Product" (Millikan Decl., Ex. 22 at §§ 1.11, 2.1) |
| MPEG-2 broadcast encoders, which perform MPEG-2 encoding | MPEG-2 encoding | "MPEG-2 Encoding Product" (Millikan Decl., Ex. 22 at §§ 1.12, 2.2) |

The 2009 License includes the same June 1, 1994 effective date as the 2002 License. (*Id.* at § 0.1) Again, this allows new licensees to obtain coverage under the license for all their previous products in exchange for "catch-up" payments. (*Id.* at § 3.3.2; Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 122:15-123:3 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.) The 2009 License similarly includes a choice of law clause specifying that New York law controls. (*Id.* at § 7.18.)

**C.   MPT is a Licensor of the MPEG-2 Pool.**

It is now undisputed that MPT has become one of the licensors to MPEG LA's MPEG-2 patent pool, and four of the five patents-in-suit—U.S. Patent Nos. 4,958,226; 5,227,878; 5,500,678; and 5,563,593[3]—are part of the pool. Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 47:16-52:7.) These four patents were previously owned by Lucent, and were asserted against Microsoft in three cases in this Court, Civil Action Nos. 02-cv-2060, 06-cv-0684, and 07-cv-0747.

As the Court will recall, while those suits were pending, Lucent entered into a merger agreement with Alcatel that stated all Lucent patents would be assigned to Alcatel. Alcatel had joined the MPEG-2 pool in 2003 and, in doing so, agreed to give MPEG LA a license, and the right to sublicense, any of Alcatel's patents found to be "essential" to MPEG-2. (*See* Millikan Decl., Ex. 3, Alcatel license to MPEG LA, § 7.5.1) This obligation extended to any patents licensable by Alcatel in the future, (*id.* at § 7.5.1; Millikan Decl., Ex. 4. at 33:6-35:18.), including

---

[3] The '593 patent should no longer be in this case. MPT failed to provide infringement contentions on the '593 as ordered by Magistrate Judge Bencivengo, and omitted the '593 from claim construction. [*See* D.I. 368; and D.I. 389.] Yet, MPT will not agree to sign a stipulation to dismiss it. Accordingly, DIRECTV is forced to include the '593 in the present motion.

those to be acquired from Lucent.  As Alcatel's then-Director of Legal and Patent Evaluation put it:

> [W]e were operating under the principle that Lucent had MPEG-2 essential patents, and under the obligations that Alcatel had with MPEG LA, through their contracts, any patents that became the property of Alcatel post-merger would come under the auspices of this agreement, and we would be obliged to add them to the patent pool.

(Trial Tr. from No. 3317-VCL, *MPEG LA v. Alcatel-Lucent et al.*, Millikan Decl., Ex. 5, Vol. II – 3-23-10, at 363:18-22, 330:20-331:3.)

Microsoft was a ███████ licensee of MPEG LA's MPEG-2 pool.  Microsoft's pool license included rights to any patents that licensors, including Alcatel acquired in the future.  Thus, the natural outcome of Alcatel's acquisition of Lucent would have been granting rights to those patents to Microsoft, extinguishing any royalties from Microsoft, and resolving of Lucent's lawsuit against Microsoft.

Rather than accept this natural outcome, Alcatel and Lucent hatched a plan to avoid Alcatel's obligations.  Two days before the merger was consummated, Lucent formed MPT and transferred the patents to it.  *See* Millikan Decl., Ex. 6, MPT Trust Agreement, at § 2.2; Millikan Decl., Ex. 7, Exhibit A to the MPT Trust Agreement.  The merged entity, Alcatel-Lucent, would receive 99% of MPT's income, and had the power to fire MPT's trustees, appoint trust advisors, and grant or withhold consent over the disposition of patents.  (*Id.* at § 3.1.)  However, asserting MPT was the new nominal "owner" of the patents, MPT (and Alcatel-Lucent) argued they were not required to submit them for inclusion in the MPEG-2 pool.

MPT and Alcatel-Lucent made that argument to this Court, over Microsoft's strenuous objections.  Because it was not a party to Alcatel's contract with MPEG LA, and was thus unable to enforce Alcatel's contractual obligations to MPEG LA, Microsoft's counterclaims and defenses based on the trust, were denied on summary judgment in two separate cases.  (*See* Order Granting in Part Denying in Part Parties' Mots. Summ. J. Regarding Defs.' Aff. Defenses & Countercls., Case No. 02-CV-2060, Doc. No. 2109 at 4-12; Order Denying Defs.' Mots. Summ J. & Granting in Part, Denying in Part Lucent's Mot. Summ. J. on Trust-Related Claims & Defenses, Case No. 07-CV-2000, Doc. No. 282 at 4-5; Order on Mots. for Summ. J., Case No. 3:06-CV-00684-H-CAB, Doc. No. 347 at 19.)

Fortunately MPEG LA, as the contracting party, took steps to directly enforce its rights on behalf of itself and licensees, who were being denied rights to which they were entitled. MPEG LA sued MPT, Alcatel-Lucent, and Lucent Technologies, Inc. in Delaware Chancery Court to enforce Alcatel's contract with MPEG LA. (Millikan Decl., Ex. 8, MPEG LA Compl., ¶¶ 1, 4, 36 & 37.) The parties proceeded to trial, which began poorly for MPT when Mr. Sideris, Alcatel's former Director of Legal and Patent Evaluation, testified that the "trust concept" arose during the pre-merger negotiations between Alcatel and Lucent. (*See* Millikan Decl., Ex. 5 at 330:20-331:6.) He also confessed that Alcatel had exerted control over the patents by encouraging Lucent's plans:

> Q.  Now, before concluding the meeting, did you, on behalf of Alcatel, give Alcatel's consent to proceeding with the trust concept?
>
> A.  It was not an overt consent. I didn't object to what they were doing and I was generally demonstrating an agreement. I didn't have the right to give authority -- to authorize what they were doing – but I wasn't objecting to it.

(*Id.* at 413:11-18.) By the second day of trial, MPT and Alcatel-Lucent foresaw the inevitable result and settled the case in chambers. MPT agreed to the precise relief MPEG LA had sought: MPT agreed to become a "Licensor" to the MPEG-2 pool, submit all its patents for possible inclusion in the pool "pursuant to MPEG LA's usual procedures," and ███████████████ ████████████████████ (Millikan Decl., Ex. 8, MPEG LA Compl. at 22 ¶¶ H-K; Millikan Decl., Ex. 9, MPEG LA Settlement, at 1 & Ex.A.) In the end, MPT was forced to add four of the five patents-in-suit to the pool, the '226, '878, '678, and '593 patents. (*See* Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 47:16-52:7; *id.* at 56:20-57:11 (explaining that MPT's four patents were added to the portfolio)) MPEG LA determined that the fifth MPT patent, the '377 patent, was not essential to the standard. (*Id.*)

When MPT joined the MPEG-2 patent pool, ████████████████████████ ███████████████████████████████████████████████ ██████████████████████ (Millikan Decl., Ex. 10; Millikan Decl., Ex. 11 (*see also* Millikan Decl., Ex. 12 (showing the corresponding "Exhibit 1" to that agreement); Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 83:9-86:13.) █████████████████████████ ███████████████████████████████████████████████

(Millikan Decl., Ex. 13; Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 86:14-87:21.)

1

## III.    THE SUMMARY JUDGMENT STANDARD

2      Summary judgment is proper when "there is no genuine dispute as to any material fact and

3  the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the movant

4  shows the absence of a genuine factual dispute, the burden shifts to the opposing party to show

5  that summary judgment is not appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

6  The opposing party cannot rest upon conclusory allegations—it must designate specific facts

7  showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

8  574, 586 (1986); *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

9

## IV.    ARGUMENT

10      DIRECTV purchases accused products from MPEG-2 pool licensees.  Those sales are

11  authorized under the 2002 MPEG-2 Patent Portfolio License and/or the 2009 MPEG-2 Patent

12  Portfolio License.  DIRECTV is thus permitted, under the doctrine of patent exhaustion, to use the

13  accused products in any manner it chooses.

14

### A.    MPT Has Exhausted Its Right to Collect Damages for Products Covered by the 2002 License.

15

16      This section addresses DIRECTV's rights during the period covered by the 2002 License.

17  The next section addresses additional rights that DIRECTV enjoys under the 2009 License.

18

### 1.    DIRECTV's Suppliers' Sales of Accused Equipment to DIRECTV Under the 2002 License Exhausted Rights to the Patents-in-Suit.

19

20      As discussed above, DIRECTV purchases many of its accused products from suppliers that

21  have taken the 2002 License. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 103:24-

22  110:3; *see also* Millikan Decl., Ex. 1 (listing DIRECTV suppliers and their MPEG LA licenses).)

23  The 2002 License authorizes those suppliers to "make, have made, use, sell, offer for sale or

24  otherwise distribute" categories of products—including the STBs, broadcast decoders, and

25  broadcast encoders accused here—from June 1, 1994 to December 31, 2010.  These broad rights

26  were authorized under all patents in the pool, including MPT's four patents. (Millikan Decl., Ex.

27  17 at §§ 2.2, 2.3, 2.5.)

28

### a)     Sales of the Accused Products Fall Squarely within the Rights Granted by the 2002 License.

By taking the 2002 License to MPEG LA's MPEG-2 patent pool, DIRECTV's suppliers obtained a bundle of rights to perform certain tasks with respect to certain types of products. In particular, they received the following grants:

- a royalty bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to *make, have made, use, and sell, offer for sale or otherwise distribute MPEG-2 Decoding Products*, MPEG-2 Decoding Software, and MPEG-2 Bundled Decoding Software[;]

- a royalty bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to *make, have made, use* for purposes other than encoding an MPEG-2 Video Event for recording on an MPEG-2 Packaged Medium*, and sell, offer for sale or otherwise distribute* MPEG-2 Encoding Products, *MPEG-2 Distribution Encoding Products*, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software; [and]

- a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to *make, have made, use* except for the purpose of generating a program stream or transport stream for recording on an MPEG-2 Packaged Medium, *and sell, offer for sale or otherwise distribute MPEG-2 Transport or Program Stream Products*.

(Millikan Decl., Ex. 17 at § 2.2, 2.3, and 2.5 (emphasis added).)

As noted above, the 2002 License further defines the terms "MPEG-2 Decoding Products," "MPEG-2 Distribution Encoding Products," "MPEG-2 Transport or Program Stream Products," and "Sale" as follows:

- "MPEG-2 Decoding Product - shall mean any instrumentality or combination of instrumentalities, including... cable, terrestrial broadcast and *satellite broadcast receiving equipment*..., which is *primarily designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard*, and which is Sold... ." (Millikan Decl., Ex. 17 at § 1.14.)

- "MPEG-2 Distribution Encoding Product - shall mean an MPEG-2 Encoding Product which is *primarily designed for encoding video information into a format in compliance with the MPEG-2 Standard* and for commercial distribution of such encoded video information, including by way of example and without limitation, distribution by terrestrial broadcast, *satellite broadcast*, and cable transmission... ." (Millikan Decl., Ex. 17 at § 1.16.)

- "MPEG-2 Transport or Program Stream Product - shall mean any instrumentality or combination of instrumentalities for use alone or with other instrumentalities, which is *primarily designed in whole or in part for generating and/or processing video information to provide an MPEG-2 transport stream* or an MPEG-2 program stream

as defined by the MPEG-2 Standard, and which is Sold... ." (Millikan Decl., Ex. 17 at § 1.27.)

- "Sale (Sold) - shall mean any sale, rental, lease, license or other form of distribution of an MPEG-2 Royalty Product to an end user, *either directly or through a chain of distribution*... ." (Millikan Decl., Ex. 17 at § 1.30.)

The licensed suppliers' sales of all STBs to DIRECTV fall within the 2002 License's grant of rights for "MPEG-2 Decoding Product(s)." DIRECTV purchases STBs from its licensed vendors and then places those STBs within its satellite system. Those STBs all satisfy the definition of "MPEG-2 Decoding Products." (*See* Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 111:1-8 ████████████████████████

████████████████████.) That is true even of STBs that are also capable of decoding H.264 signals. (*Id.*; Millikan Decl., Ex. 17 at § 1.7, 2.2 ("Licensed Products" include "MPEG-2 Decoding Products").)

Similarly, broadcast decoders also fall within the definition of "MPEG-2 Decoding Product(s)" in the 2002 License. They are a type of "satellite broadcast receiving equipment," one of the 2002 License's examples of products in that category. (*Id.* at § 1.14.) While DIRECTV places the broadcast decoders at different locations in their network than STBs, that difference is irrelevant for purposes of the 2002 License. In both instances, the equipment DIRECTV purchases is "primarily designed in whole or in part" to decode MPEG-2 signals.

Licensed suppliers' sales of broadcast encoders to DIRECTV are all also authorized by the 2002 License. DIRECTV purchases broadcast encoders to encode video and distribute encoded signals to customers. All of DIRECTV's broadcast encoders fall into one or both categories expressly defined in the license: (1) encoders performing MPEG-2 video compression, and/or (2) encoders packaging video using MPEG-2 transport stream functionality.

Broadcast encoders that perform MPEG-2 video compression are covered by the 2002 License as "MPEG-2 Distribution Encoding Products." Because broadcast encoders are "video telecommunication equipment" primarily designed to encode video in compliance with the MPEG-2 Standard and "commercial[ly] distribut[e]" that information, they qualify as "MPEG-2 Distribution Encoding Products." (*See also* Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition

1    at 111:12-112:6 (explaining that MPEG-2 Distribution Encoding Products includes MPEG-2

2    encoders in a broadcast facility).)

3       Conversely, broadcast encoders packaging video using MPEG-2 transport stream

4    functionality are "MPEG-2 Transport or Program Stream Products" for purposes of the 2002

5    License because they are "primarily designed in whole or in part for generating and/or processing

6    video information to provide an MPEG-2 transport stream." (Millikan Decl., Ex. 17 at § 1.27.) A

7    broadcast encoder generating an MPEG-2 transport stream falls under this category even if the

8    video is compressed in another format, such as H.264. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6)

9    deposition at 112:7-113:14.) All of DIRECTV's broadcast encoders—including encoders that

10    perform H.264 video compression—generate an MPEG-2 transport stream when packaging the

11    compressed video. (*See, e.g.*, Millikan Decl., Ex. 23 at 9 ███████████████.)

### b)  The '226, '878, '678, and '593 Patents Are Part of the MPEG-2 Pool.

      There is no dispute that four of the patents-in-suit are included in MPEG LA's MPEG-2

pool. MPT was finally forced to license the '226, '878, '678, and '593 patents to the MPEG-2

pool after they were deemed "MPEG-2 Essential Patents" in October, 2010. (Millikan Decl., Ex.

2, MPEG LA 30(b)(6) deposition at 47:16-52:7; Millikan Decl., Ex. 9, MPEG LA Settlement

Agreement, at Ex. A.) As a result, these patents became part of the bundle of patent rights

licensed to all pool licensees, including DIRECTV's licensed suppliers, with respect to the

categories of Licensed Products discussed above. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6)

deposition at 114:6-14; Millikan Decl., Ex. 17 at §§ 2.2, 2.3, 2.5.)

      Pool licensees obtained a license to the patents going forward, as well as a license for all

sales of Licensed Products since the effective date of the 2002 License, June 1, 1994, in exchange

for the payments already made to MPEG LA for their accused products. (*Id.* at §§ 0.1, 3.3.2.) In

other words, once MPT put the four patents into the pool, the 2002 License gave DIRECTV's

licensed suppliers broad rights to the four patents that had *nunc pro tunc* effect back to the

effective date. (*Id.*) Thus it was as if all the licensed suppliers' sales of Licensed Products to

DIRECTV had been licensed at the time they were made. (Millikan Decl., Ex. 2, MPEG LA

30(b)(6) deposition at 122:15-123:3; 90:15-91:22 ███████████████

████████████████; *see also* Millikan Decl., Ex. 24 at 2 (MPEG LA's website explaining that, when new patents are added to the pool, "[l]icensees enjoy coverage under such patents from the License effective date (June 1, 1994) forward."); Millikan Decl., Ex. 25 at 11 ███████████

████████████████████████████████████████████████████████

████.)

## 2.    Exhaustion Applies When, as Here, the Original Sale is Licensed.

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Patent exhaustion "prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638. Once a patentee's rights are exhausted by an authorized sale, it is barred from suing others who subsequently use or sell the same article for infringement. *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1276 (Fed. Cir. 2009).

The facts of *TransCore* illustrate how the doctrine works. There, the patentee had entered into a settlement agreement with a company called Mark IV that authorized its sales of patented toll collection equipment. *See* 563 F.3d at 1273-74. Mark IV made authorized sales of the equipment to the Illinois State Toll Highway Authority. *Id.* Another company, ETC, agreed to work with Illinois to set up and test Mark IV's equipment. *Id.* The patentee sued ETC for patent infringement. *Id.* The Federal Circuit held the suit was barred by the doctrine of exhaustion because ETC was using the same equipment whose sale was authorized by the settlement agreement. *Id.*

Similarly, in *Quanta*, the issue was whether the patentee had authorized certain sales of products embodying the asserted patent. *Id.* at 636. Specifically, patentee LG had licensed a portfolio of patents to Intel. *Id.* at 623. While the License Agreement authorized Intel to "'make, use, sell (directly or indirectly), offer to sell, import or otherwise dispose of'" its own products practicing LG's patents, it did not grant Intel the right to practice the patents in conjunction with non-Intel products. *Id.* Quanta purchased products from Intel substantially embodying the LG

1  patents and combined them with non-Intel products to practice the licensed patents. *Id.* The

2  Supreme Court held LG's patent rights were exhausted upon Intel's authorized sale to Quanta.

3  Although Intel was not licensed to practice the patents using non-Intel parts, "[n]othing in the

4  License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who

5  intend to combine them with non-Intel parts." *Id.* at 636. Rather, the agreement "broadly

6  permit[ted]" Intel to make, use, or sell products free of LG's patent claims. *Id.* Indeed, the

7  agreement "authorized Intel to sell products that practiced the [asserted patents]. No conditions

8  limited Intel's authority to sell products substantially embodying the patents." *Id.* at 637

9  (emphasis added). Because Intel was authorized to sell its products to Quanta, the doctrine of

10  patent exhaustion prevented LG from further asserting its patent rights against those products. *Id.*

11       MPT's infringement claims against DIRECTV for the '226, '878, '678, and '593 patents

12  are thus barred for the same reason as in *TransCore* and *Quanta*. As discussed in the previous

13  section, the 2002 License authorized DIRECTV's licensed suppliers to "make, have made, use,

14  and sell, offer for sale or otherwise distribute" the accused STBs, broadcast encoders, and

15  broadcast decoders from June 1, 1994 to December 31, 2010. MPT accuses these products of fully

16  practicing the patents-in-suit, satisfying the "substantially practice" requirement. (Millikan Decl.,

17  Ex. 20.) All DIRECTV's accused purchases from licensed suppliers during that period involve

18  equipment subject to an authorized sale. Therefore, DIRECTV is in the same position that ETC

19  occupied in *TransCore*, and that Quanta occupied in *Quanta*. This Court should likewise find that

20  MPT's infringement claims under those four patents are barred by the doctrine of exhaustion.

21        **3.**    **The 2009 License Is Not a Novation of the 2002 License.**

22       MPT's primary excuse why accused products DIRECTV purchased from vendors licensed

23  under MPEG LA's 2002 License are still infringing is its claim that the 2009 License was a

24  novation that retroactively extinguished the 2002 License and retroactively resurrected previously

25  exhausted patent rights in hundreds of millions of products sold by the fourteen hundred or more

26

27

28

1  pool licensees under the 2002 License.  As this section details, that argument fails for multiple

2  reasons.[4]

3             a)      **The 2009 License's Boilerplate Integration Clause Fails to Meet**

4                        **New York's Strict Test for Novation.**

5       MPT has the burden of demonstrating four elements to show there was a novation:  "'a

6  previous valid obligation, agreement of all parties to the new obligation, extinguishment of the old

7  contract, and a valid new contract.'"  *Ruso v. Morrison*, 695 F. Supp. 2d 33, 53 (S.D.N.Y. 2010)

8  (quoting *Wasserstrom v. Interstate Litho Corp.*, 495 N.Y.S.2d 217, 219 (N.Y. App. Div. 1985)).

9  "'New York courts have set a ***stringent standard for novation***.'"  *Id.* (quoting *Abuelhija v.*

10 *Chappelle*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)).  "Because a novation has the

11 effect of extinguishing the prior contract between the parties," those courts have ruled that "the

12 existence of a novation 'must ***never*** be presumed.'"  *In re Cohen*, 422 B.R 350, 374 (E.D.N.Y.

13 2010) (emphasis added) (quoting *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 736

14 F. Supp. 1281, 1284 (S.D.N.Y. 1990)).  Rather, "the party asserting the novation's existence has

15 the burden of proving that the subsequent agreement was intended as a complete substitute for the

16 parties' prior agreements."  *Cohen*, 422 B.R at 373.  Where, as here, the parties' intent "can be

17 found in the unequivocal language of the contract, the court may grant summary judgment."  *Id.*

18      MPT's sole textual basis in the 2009 License for its novation argument is the boilerplate

19 integration clause, designed to bar parol evidence:

20         7.20.1  The provisions of this Agreement, including its attachments and any amendments,
           constitute the entire agreement between the parties, and supersede any and all prior

21         communications and understandings, oral or written, between the parties relating to the
           subject matter hereof.

22 (Millikan Decl., Ex. 22 at §7.20.1.)  But this language fails to satisfy the third factor, *i.e.*, that "the

23 old obligation is extinguished," as "the presence of a merger clause is ***not*** determinative of the

24 novation inquiry."  *Cohen*, 422 B.R at 374 n.7 (emphasis added) (quoting *Abuelhija v. Chappelle*,

25 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)).  Indeed, New York courts have examined

26 integration clauses virtually identical to the one in the 2009 License and expressly rejected this

27 very argument, finding that "[a]n intent to extinguish earlier contractual obligations cannot be

28

---

[4] DIRECTV will fully brief its opposition to MPT's "novation" theory in its response to MPT's

1   inferred from a standard merger clause simply because the parties to the later agreement also

2   entered an earlier contract on a related topic.  The merger clause does not evidence a 'clear

3   expression' of intent to extinguish a separate and distinct written contract." *Abuelhija v.*

4   *Chappelle*, 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)).

5          New York courts have routinely rejected the argument that a boilerplate merger clause as a

6   novation.  *See Globe Food Servs. Corp. v. Consol. Edison Co. of N.Y., Inc.*, 584 N.Y.S.2d 820, 821

7   (N.Y. App. Div. 1992) (holding that a clause stating that "[t]his contract shall replace all prior

8   agreements between Globe and Con Edison" did not extinguish a prior contract between the

9   parties because "the contract language and the circumstances are ambiguous"); *Cohen*, 422 B.R. at

10  375 (finding an integration clause referring to "prior understanding and agreements" did not

11  constitute a novation given other provisions suggesting a prior contract was still enforceable); *In re*

12  *Primex Int'l Corp.*, 89 N.Y.2d 594, 599-601 (1997) (holding that a merger clause in a later

13  contract did not demonstrate an intent to eliminate an arbitration clause that appeared in an earlier

14  contract but not in the later one); *Dialcom, LLC v AT&T Corp.*, 2008 WL 2581876, at *9-10 (N.Y.

15  Sup. Ct. 2008) (unreported disposition) (holding that an integration clause only barred evidence of

16  the parties' understandings leading to the contract of which it was a part and did not suggest the

17  contract had retroactive effect to earlier periods); *Security Watch, Inc. v. Sentinel Sys., Inc.*, 176

18  F.3d 369, 372-73 (6th Cir. 1999) (applying Tennessee law to hold that a merger clause referring to

19  "prior contracts and understandings" but not "prior agreements" or "prior contracts" did not

20  extinguish a prior written contract between the parties).

21         MPT also cannot satisfy the second or fourth prongs of the novation analysis either.  While

22  the 2009 License was undoubtedly signed by numerous licensees, including DIRECTV's licensed

23  vendors, ███████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████

26  ██████████████████████████████████████  (Millikan Decl., Ex. 21 at 235:16-18.)

27

28

___

motion, and will merely paraphrase its arguments here.

Case No. 09-cv-0278 H (CAB)

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████

3     Similarly, MPT cannot demonstrate the drop in royalty rates between the 2002 and 2009

4 Licenses was meant to be consideration for a novation. ████████████████████████████

5 ██████████████████████████████████████████

6 █████████████████████████████████████████████████

7 ███████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████  (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 124:23-125:2.)

10     Because MPT's novation argument fails as a matter of law, the Court should hold that the

11 sales of accused equipment to DIRECTV from licensed suppliers were authorized by the 2002

12 License, thus barring MPT's infringement claims for the '226, '878, '678, and '593 patents under

13 the doctrine of exhaustion.

14        **b)    The 2009 License Cannot Novate the 2002 License Because the
              2009 License Fails to Specifically Mention the 2002 License.**

15     When a contract places limits on amending the terms, those limits apply equally to

16 terminating, rescinding, or novating the contract. *See, e.g., Cary Oil Co., Inc. v. MG Ref. & Mktg.,*

17 *Inc.*, 90 F. Supp. 2d 401, 417 n.85 (S.D.N.Y. 2000) (stating that contracts which "do not expressly

18 prohibit oral rescission, but merely amendment, waiver or departure" cannot be orally *rescinded*,

19 because "[r]ecission necessarily is included in amendment, waiver or departure"); *Arzani v.*

20 *People*, 149 N.Y.S.2d 38, 40 (N.Y. Sup. Ct. 1956) (explaining that novation involves

21 "rescission").

22     Here, the 2002 License dictates that "[N]o amendment of this Agreement shall be effective

23 unless such amendment is in writing and ***specifically references this agreement***, and is signed by

24 all parties hereto." (Millikan Decl., Ex. 17 at § 7.20.2 (emphasis added).)  But MPT has not

25 shown any written amendment that "specifically references" the 2002 License to alter or terminate

26 it.  Indeed, the new license grants in the 2009 License do not mention the 2002 License at all. (*See*

27 Millikan Decl., Ex. 22 at §§ 2.1, 2.2, 2.3.)  Nor does the boilerplate integration clause that MPT

28 points to as the basis for novation.  That clause does not even mentions "previous contracts" or

1  "previous agreements."  Rather, it merely references "prior communications and understandings"

2  generically as a way to exclude parol evidence.

3       By contrast, when the 2002 License was adopted, MPEG LA and all its licensees executed

4  ███████████████████████████████████████████████████████████████████

5  ██████████████████████████████████████████████████████ (*See,*

6  *e.g.*, Millikan Decl., Ex. 26; Millikan Decl., Ex. 27; Millikan Decl., Ex. 2, MPEG LA 30(b)(6)

7  deposition at 130:25-131:14, 131:21-23.)  If the parties had agreed that the 2009 License would

8  cancel or rescind the 2002 License, █████████████████████████████

9  █████████████████████████ (Millikan Decl., Ex. 17 at § 7.20.2.)

          **c)**    **The MPEG LA Agreement Among Licensors that MPT Signed Prohibits the 2009 License from Being a Novation.**

     As explained above, any novation would necessarily be considered an amendment to the 2002 License, and the 2002 License can be amended so long as the licensors approve.  (Millikan Decl., Ex. 18 §§ 1.8, 6.3.)  But, the Agreement Among Licensors dictates that "[a]ny Amendment to the MPEG-2 Patent Portfolio License" must be "***applied prospectively***."  (Millikan Decl., Ex. 18 § 6.3 (emphasis added).)  Thus, MPT's insistence that the 2009 License was a retroactive novation is prohibited by the very Agreement Among Licensors MPT adopted to join MPEG LA's MPEG-2 pool.

          **d)**    **Even if the 2009 License Was a Novation, It Cannot Resurrect the Rights Exhausted by the Authorized Sale of Products Under the 2002 License.**

     Finding that the 2009 License was a novation and separately that such a novation retroactively resurrected all of the patent rights terminated by authorized sales under the 2002 License for not just the licensees but its customers would undermine the protection of innocent third parties provided by the law of patent exhaustion.  This would be true not just for MPT's patents, but for all the patents in the pool, all fourteen hundred or more licensees, and the hundreds of millions of products sold under the 2002 License.

     It is "well settled that an authorized sale of a patented product places that product beyond the reach of the patent." *Intel Corp. v. ULSI Sys. Tech.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). "The patent owner's rights with respect to the product end with its sale." *Id.* Here, third parties

1   like DIRECTV purchased MPEG-2 products from licensees of the pool with the understanding

2   they were making authorized purchases and could freely use or sell the products to practice any

3   patent "essential" to the MPEG-2 standard.  If the Court construes the 2009 License as a novation

4   and separately that the novation retroactively eliminated all rights under the 2002 License, as MPT

5   urges, then it would be allowing patent owners to pull the rug out from under those third parties,

6   who relied on the 2002 License.  That would defeat the purpose of having patent pools for

7   standards like MPEG-2.  The purpose of the pool is to induce people to use the standard by

8   assuring them that they can obtain all the necessary rights from the pool licensors in one place.

9   (Millikan Decl., Ex. 17 at 2 ("[E]ach Licensor … desires to encourage widespread adoption of the

10   MPEG-2 Standard….  Licensors desire to make available through [MPEG LA] license rights…

11   thereby avoiding the need of such individual … to obtain a separate license from each

12   Licensors….).)  If the pool's licensors, like MPT, could back out at any time, then no one would

13   want to purchase products using the standard, and everyone would suffer, especially the consumer.

**B.**    **The 2009 License Also Grants Rights to MPT's Patents for at Least MPEG-2 Broadcast Decoders and MPEG-2 Broadcast Encoders.**

The preceding section addressed DIRECTV's rights during the period covered by the 2002 License.  This section addresses additional rights that DIRECTV enjoys under the 2009 License. It is important to understand that in this section DIRECTV addresses only a subset of the rights that it possesses under the 2009 License.  DIRECTV believes that this subset is ripe for summary judgment, while other issues may require additional discovery or may be subject to fact disputes, as DIRECTV will explain in its opposition to MPT's summary judgment motion on the 2009 License.

**1.**    **DIRECTV's Suppliers' Sales of Accused Equipment to DIRECTV Under the 2009 License Exhausted Rights to Four of the Patents-in-Suit**

At a minimum, DIRECTV's purchases of the MPEG-2 functionality in the accused MPEG-2 broadcast decoders and MPEG-2 broadcast encoders are authorized by the 2009 License.  Not even MPT contests this point in its own motion for summary judgment.

DIRECTV purchases this functionality from suppliers who are parties to the 2009 License. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 103:24-110:3; *see also* Millikan Decl.,

Ex. 1 ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

███████.)  The 2009 License grants rights related to two categories of products relevant here:

"MPEG-2 Decoding Products" and "MPEG-2 Encoding Products."  Upon paying the required

royalties and complying with the other provisions of the agreement, DIRECTV's licensed

suppliers obtain the following rights:

- a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all
MPEG-2 Patent Portfolio Patents to make, have made, use, and Sell, or offer for Sale
MPEG-2 Decoding Products (i) that bear the brand name owned or licensed by License
or (ii) Sold without a brand-name if the decision to do so is at the discretion of
Licensee, [and]

- a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all
MPEG-2 Patent Portfolio Patents to make, have made, use for purposes other than
encoding an MPEG-2 Video Event for recording on an MPEG-2 Packaged Medium,
and Sell or offer for Sale MPEG-2 Encoding Products (i) that bear the brand name
owned or licensed by Licensee or (ii) Sold without a brand-name if the decision to do
so is at the discretion of Licensee.

(Millikan Decl., Ex. 22 at § 2.1, 2.2.)

The 2009 License further defines the terms "MPEG-2 Decoding Products," "MPEG-2

Encoding Products," and "End User" as follows:

- "MPEG-2 Decoding Product – shall mean any instrumentality or combination of
instrumentalities, including . . . cable broadcast, terrestrial broadcast, *satellite
broadcast* or IPTV television 'set-top box' or receiving equipment. . . which is capable
of or primarily designed in whole or in part for decoding video information in
accordance with the MPEG-2 Standard, and which is Sold to an End User."  (Millikan
Decl., Ex. 22 at § 1.11.)

- "MPEG-2 Encoding Product – shall mean any instrumentality or combination of
instrumentalities, including . . . encoding software, an encoder, a DVD recorder, a Blu-
ray Disc recorder, a digital video recorder or personal video recorder(,) television
signal transmitting equipment, a computer card, a digital camcorder, *video
telecommunications equipment* and consumer video recording equipment, *which is
capable of or primarily designed in whole or in part for encoding video information
into a format in compliance with the MPEG-2 Standard*."  (Millikan Decl., Ex. 22 at
§ 1.12.)

- "End User – shall mean any person or entity which orders, sends, purchases, retrieves,
receives, or is specifically sent an MPEG-2 Royalty Product only for the End User's
personal or *commercial use* . . .  and *not for re-Sale*."  (Millikan Decl., Ex. 22 at § 1.6.)

1    All DIRECTV's purchases of MPEG-2 broadcast decoders fall within the license grant for

2    MPEG-2 Decoding Products. The four MPT patents are part of the MPEG-2 pool's Patent

3    Portfolio, as discussed above. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6) deposition at 47:16-

4    52:7.) All the accused broadcast decoders meet the definition of "MPEG-2 Decoding Products"

5    because they are "cable broadcast, terrestrial broadcast, satellite broadcast . . . receiving

6    equipment" that are "capable of or primarily designed in whole or in part for decoding video

7    information into a format in compliance with the MPEG-2 Standard," and thus fall within the

8    relevant class of products. (Millikan Decl., Ex. 20.) Moreover, DIRECTV qualifies as an "End

9    User" for these decoders because it uses them for "commercial" use in its Broadcast Center, and

10   all the accused decoders it buys bear the brand names of its licensed suppliers which MPT cannot

11   contest. (*See, e.g.*, Millikan Decl., Ex. 28, ███████████████████████████████

12   ██████████████████████████.) Therefore, all DIRECTV's purchases of the

13   MPEG-2 functionality in the accused MPEG-2 broadcast decoders from licensed suppliers are

14   authorized under the 2009 License.

15       In addition, the MPEG-2 functionality in the accused MPEG-2 broadcast encoders falls

16   within the license grant for MPEG-2 Encoding Products. The four MPT patents are part of the

17   MPEG-2 pool's Patent Portfolio, as discussed above. (Millikan Decl., Ex. 2, MPEG LA 30(b)(6)

18   deposition at 47:16-52:7.) Those broadcast encoders meet the definition of "MPEG-2 Encoding

19   Products" because they are "video telecommunications equipment" that are "capable of or

20   primarily designed in whole or in part for encoding video information into a format in compliance

21   with the MPEG-2 Standard," and thus fall within the relevant class of products. (Millikan Decl.,

22   Ex. 20.) Moreover, DIRECTV qualifies as an "End User" for these encoders because it uses them

23   for "commercial" use in its Broadcast Center, and all the accused encoders it buys bear the brand

24   names of its licensed suppliers which MPT cannot contest. (*See, e.g.*, Millikan Decl., Ex. 29,

25   ████████████████████████████████████████████████████████████████.)

26   Therefore, sales of the accused MPEG-2 broadcast encoders to DIRECTV from licensed suppliers

27   are authorized under the 2009 License.

28

2.     **Exhaustion Applies When, as Here, the Original Sale is Licensed.**

The exhaustion analysis with respect to the 2009 License is the same as with respect to the 2002 License. "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Quanta*, 553 U.S. at 638. Based on MPT's own infringement contentions, the accused products substantially embody the patents-in-suit. So where, as here, sales of a subset of the accused products from licensed suppliers to DIRECTV are authorized under the 2009 License, the doctrine of exhaustion bars MPT from maintaining its infringement claims for the '226, '878, '678, and '593 patents against that subset of products. *TransCore*, 563 F.3d at 1273-74, 1276.

## V.     CONCLUSION

For the reasons explained above, the Court should hold that MPT's infringement claims under the '226, '878, '678, and '593 patents against accused products that DIRECTV acquired through authorized sales from its licensed suppliers under either the 2002 License or 2009 License are barred by the doctrine of exhaustion.

Dated:  July 29, 2011

FISH & RICHARDSON P.C.

By:  /s/ Thomas N. Millikan
     Thomas N. Millikan

Attorneys for Defendants
DIRECTV, INC., DIRECTV ENTERPRISES,
LLC, THE DIRECTV GROUP, INC.,
DIRECTV HOLDINGS  LLC, DIRECTV
OPERATIONS LLC

1

## **CERTIFICATE OF SERVICE**

2      The undersigned hereby certifies that a true and correct copy of the above and foregoing

3   document has been served on July 29, 2011 to all counsel of record who are deemed to have

4   consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any

5   other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

6

7                                              _/s/ Thomas N. Millikan_
                                               Thomas N. Millikan
8

9                                              Attorneys for Defendant, Counter-claimant
                                               DIRECTV, Inc., DIRECTV Enterprises, LLC,
10                                             The DIRECTV Group, Inc., DIRECTV Holdings
                                               LLC, DIRECTV Operations LLC
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28